819 F.2d 1471
 23 Fed. R. Evid. Serv. 530
 CERRO GORDO CHARITY, an Iowa non-profit corporation and
Attorney General of the State of Minnesota,
v.
FIREMAN'S FUND AMERICAN LIFE INSURANCE COMPANY, a California
insurance corporation, Appellee,
and American National Bank & Trust Co., personal
representative of the Estate of May V. Wilson.
Appeal of Leonard J. RICHARDS (non-party).
CERRO GORDO CHARITY, an Iowa non-profit corporation and
Attorney General of the State of Minnesota,
v.
NORTH AMERICAN LIFE AND CASUALTY COMPANY, Appellee,
and American National Bank & Trust Co., personal
representative of the Estate of May V. Wilson.
Appeal of Leonard J. RICHARDS (non-party).
 Nos. 86-5002, 86-5003.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 10, 1986.
Decided May 29, 1987.
 
 Richard G. Mark, St. Paul, Minn., for Cerro Gordo Charity.
 F. Patrick McGrath, St. Paul, Minn., for Leonard J. Richards--non-party.
 Steven Jamar, Minneapolis, Minn., for Fireman's Fund.
 Robert S. Cragg, Minneapolis, Minn., for North American Life & Cas. Co.
 Before WOLLMAN and MAGILL, Circuit Judges, and HANSEN,* District judge.
 WOLLMAN, Circuit Judge.
 
 
 1
 May Wilson was found dead in the basement of a north Minneapolis storefront on May 21, 1982. Thereafter, Cerro Gordo Charity, a beneficiary of several accidental death and dismemberment insurance policies on Ms. Wilson's life, brought separate actions against North American Life and Casualty Company (North American) and Fireman's Fund American Life Insurance Company (Fireman's Fund) to collect $450,000 in proceeds.
 
 
 2
 The insurers denied payment, alleging that the policies were void ab initio because they were obtained as a result of a fraudulent scheme by May Wilson's half-brother, Leonard Richards, to have his sister murdered in order to collect the insurance proceeds. Based upon the verdict of the jury, the district court[1] dismissed Cerro Gordo's claims against the defendants. Cerro Gordo now appeals.
 
 
 3
 * Reduced to its most basic form, this case is relatively simple. It involves May Wilson; her half-brother, Leonard Richards; an Iowa Charity, Cerro Gordo; and three insurance policies. The fundamental question presented is whether Richards killed, or caused to have killed, his half-sister with the intent to recover the insurance proceeds and defraud the insurance companies. As will be seen, however, this simplicity is quickly lost in a maze of trust funds, insurance policies, psychiatrists, alumni associations, churches, corporations, unusual occurrences, and, of course, the usual sprinkling of legal questions. At times this intriguing factual scenario seems to be based on some murder mystery or television detective drama. For all the gambits, legal and otherwise, that this case has produced, however, overshadowing all is the stark reality of the murder that the jury found had been committed and the motive that resulted in May Wilson's death.[2]
 
 
 4
 * May Wilson was born on May 12, 1926. After graduating from high school in 1944, she earned a nursing degree from Cleveland City Hospital School of Nursing and a bachelor's degree in biological science and education from Ohio State University. She later received a master's degree in nursing administration from the University of Minnesota. In 1962, she joined the Air Force as a captain. Her initial responsibilities were as a coordinator of educational programs for nurses. She was later promoted to major and was responsible for in-flight training and education of nurses. In 1965, she became assistant chief nurse at Clark Air Force Base Hospital in the Philippines. Despite her successful career in the Air Force, however, Wilson had to leave military service in 1968 as a result of medical problems. She was honorably discharged and placed on total disability status.
 
 
 5
 Following her return to civilian status, Wilson's life took a turn for the worse. From 1968 until her death in 1982, she was hospitalized many times for both physical and mental ailments. There is evidence of a number of suicide attempts or threats of suicide. During this period, she was treated by a dozen or more psychiatrists, with frequent long-term hospitalizations of a psychiatric nature. She constantly took a number of drugs to relieve her anxiety and depression and to help her sleep. As a part of her treatment she received electro-shock therapy on a number of occasions. Her diagnoses included depressive psychosis, cyclical depression, severe anxiety, hysterical personality disorder, and drug dependency. Although there is testimony in the record characterizing Wilson as a demanding, strong-willed, and competent person, there is also evidence that at times she was incapable of performing even simple tasks because of her mental condition.
 
 B
 
 6
 The other key figure in this case is Leonard Richards, Wilson's half-brother. Richards was ordained a minister by his mother and has incorporated a number of churches. Though he refused to testify at trial, Richards did indicate that he is currently a "management consultant." His activities have been conducted through many corporations and other entities bearing his home address or that of a small storefront office. The role that Richards played in Wilson's life will come into greater focus as we elaborate on the events leading up to this litigation.
 
 C
 
 7
 From 1975 through 1979, Wilson was insured by as many as 46 policies of hospital income protection (HIP) insurance. HIP plans are designed to pay a certain amount of money for each day a person is hospitalized, regardless of the costs of the medical care or the existence of medical insurance. Wilson obtained this insurance through membership in a large and diverse group of organizations ranging from the National Rifle Association to the American Waterworks Association. According to a conservatorship accounting in 1978, Wilson belonged to some 80 different organizations, including some 50 alumni associations.
 
 
 8
 Wilson was frequently hospitalized in Mexico and Costa Rica during the winter months. Claims were handled by Richards and two attorneys. Upwards of $700,000 was collected from the insurance companies under these policies. The proceeds, however, did not go directly to Wilson but instead went into certain trusts controlled by Richards.
 
 
 9
 After the insurance companies began contesting payment under the HIP policies, there was a build-up of accidental death and dismemberment (AD & D) insurance. About the time the policies were being procured, Richards created a number of trusts, both charitable and otherwise. These trusts were designated as beneficiaries of the policies. One of these charitable trusts is the appellant in this case, Cerro Gordo Charity (Cerro Gordo). Wilson's will was also drawn up during this time, naming some of the trusts as beneficiaries. At the time of Wilson's death, AD & D insurance in excess of $3.5 million had been taken out on her life.
 
 D
 
 10
 Cerro Gordo is an Iowa non-profit corporation, organized in 1978 and registered as a charity with the Minnesota Attorney General. It has been granted tax-exempt status by the Internal Revenue Service. Cerro Gordo was funded with some of the proceeds from HIP settlements with the insurance companies. Leonard Richards, May Wilson, and Sanni Richards (the mother of Leonard and May) were the initial voting members and directors of Cerro Gordo. Cerro Gordo's articles of incorporation contained an anti-deadlock provision in effect while Richards was a voting member that gave him full control. By February 1982, Richards was the only voting member of Cerro Gordo. He then elected James Reichert, an attorney, as a voting member; the two were the sole voting members of the charity at the time of Wilson's death.[3] Prior to Wilson's death, the only charitable activity of Cerro Gordo was a grant to the Wilson Lectures in American Penology, a tax-exempt, non-profit corporation controlled by Richards. The funds were used to pay a college professor for a paper and a speech.
 
 E
 
 11
 On May 21, 1982, Wilson was found dead in the locked basement of a north Minneapolis storefront leased by one of Richards' corporations, Administration Center, Inc. Her body was found partially clothed beneath a pile of flattened boxes in the basement. There were two stab-like wounds to her neck. According to the medical examiner, Wilson had been dead for at least five or six days, but probably not more than fourteen days, by the time her body was discovered. Two unopened condoms were found near the body, and a key was found in the victim's vagina. There were no defense wounds on the body, and Wilson's clothing was not torn. The upstairs windows had been covered with opaque wax paper. Wardrobe boxes containing women's clothing were found in the upstairs area; some items had labels bearing Wilson's name. Various blood stains were found, indicating that the body had been upstairs at one time. The medical examiner testified that the body had been moved following death and that it was possible that the scene had been altered to make it look like a sexual assault. No murder weapon or fingerprints were found.
 
 
 12
 Following Wilson's death, Cerro Gordo, as beneficiary, brought separate actions against North American and Fireman's Fund to collect on three AD & D policies issued by the companies on Wilson's life. The cases were consolidated for trial.
 
 
 13
 The insurance companies contended at trial that they should not be required to honor the policies because Richards had murdered Wilson as part of a fraudulent scheme to obtain the insurance proceeds. As an affirmative defense to the payment of the insurance proceeds, the insurance companies had the burden of establishing: (1) that Wilson did not have an independent motivation to procure the insurance and did not acquire the insurance with the intent to insure her life, but instead served as a mere instrumentality through which Richards obtained the insurance; (2) that Richards intended to murder Wilson at the time the policies were procured; and (3) that Richards murdered Wilson as part of a fraudulent scheme to obtain the insurance proceeds. See New England Mut. Life Ins. Co. v. Null, 605 F.2d 421 (8th Cir.1979). After some three weeks of testimony, the jury returned a special verdict, essentially finding that Richards had intentionally killed his half-sister to obtain the insurance proceeds. Judgments were then entered dismissing Cerro Gordo's claims against the insurance companies.
 
 
 14
 Cerro Gordo raises the following issues on appeal: (1) whether the transcript of the testimony in a prior action of a psychiatrist who treated Richards was properly admissible under Minnesota law; (2) whether the district court erred in allowing the insurance companies to call Richards to the stand for the sole purpose of having the jury hear him invoke his fifth amendment privilege; (3) whether it was improper for evidence of purported "other acts" of Richards to be admitted into evidence; (4) whether the district court erred in either refusing to allow complete disclosure of the Hennepin County investigative files relating to May Wilson's death or in refusing to stay the proceeding until the state court had made a determination on the availability of the file; and (5) whether the jury's special verdict was supported by the evidence. We address each issue separately.
 
 II
 
 15
 In 1979, Richards brought an action in a Minnesota conciliation court against six insurance companies to recover insurance benefits for a 1977 hospitalization. As part of his case-in-chief, Richards called Dr. James Guerrero, a psychiatrist who had treated Richards in 1977, to testify concerning the nature and necessity for the medical treatment Richards received. At that trial, Dr. Guerrero testified that Richards had told him that he had been managing his sister's financial affairs. Dr. Guerrero also testified that Richards had made several unveiled remarks about killing Wilson. The testimony was given in open court and reduced to a written transcript.
 
 
 16
 During the trial of this case, the insurance companies sought to call Dr. Guerrero as a witness, contending that the physician-client privilege had been waived by Richards' having called him to testify at the conciliation court proceeding. The district court ruled that there had been only a "limited" waiver of the privilege. Since it was not a complete waiver, the court determined that the doctor was unavailable to testify under Fed.R.Evid. 804(a)(1). The court then ruled that the transcript of Dr. Guerrero's testimony at the conciliation court proceeding was admissible under Fed.R.Evid. 804(b)(1) and (b)(5). The transcript of Dr. Guerrero's testimony was subsequently read to the jury. Cerro Gordo argues that the transcript of the testimony was improperly admitted into evidence.
 
 
 17
 * The first question to be considered is whether there was a waiver by Richards of the physician-patient privilege.[4] Since this is a diversity action, we must follow Minnesota law on the law of privileges. Fed.R.Evid. 501.
 
 
 18
 The general rule establishing the medical privilege in Minnesota is set forth in Minn.Stat. Sec. 595.02 subd. 1(d), which provides:
 
 
 19
 A licensed physician * * * shall not, without the consent of the patient, be allowed to disclose any information or any opinion based thereon which the professional acquired in attending the patient in a professional capacity, and which was necessary to enable the professional to act in that capacity; after the decease of the patient, in an action to recover insurance benefits, where the insurance has been in existence two years or more, the beneficiaries be deemed to be the personal representatives of the deceased person for the purpose of waiving this privilege, and no oral or written waiver of the privilege shall have any binding force or effect except when made upon the trial or examination where the evidence is offered or received.[5]
 
 
 20
 Rule 35.03 of the Minnesota Rules of Civil Procedure discusses the waiver of the physician-patient privilege:
 
 
 21
 If at any stage of an action a party voluntarily places in controversy the physical, mental or blood condition of himself, of a decedent, or a person under his control, such party thereby waives any privilege he may have in that action regarding the testimony of every person who has examined or may thereafter examine him or the person under his control in respect of the same mental, physical or blood condition.
 
 
 22
 Cerro Gordo asserts that even though Richards placed his medical condition in controversy in the conciliation court proceeding, and thus waived his medical privilege in that action, he has not placed his medical condition in controversy in this lawsuit. Therefore, Cerro Gordo argues, there was no waiver of Richards' privilege for purposes of this action.
 
 
 23
 The implication of Cerro Gordo's argument is that if Richards did not waive his privilege under Rule 35.03, he did not waive it at all for purposes of this lawsuit. Cerro Gordo asserts that Knudsen v. Peickert, 301 Minn. 287, 221 N.W.2d 785 (Minn.1974) is controlling. In Knudsen, the plaintiff's wrongful death action claimed that her son's death had been caused in part by Peickert's negligent driving. Before trial, the plaintiff sought to obtain Peickert's medical records. The trial court denied her request on the ground that the records were protected by the physician-patient privilege. The plaintiff argued on appeal that the privilege had been waived as a result of Peickert's institution of prior lawsuits for personal injury in state and federal court against the special administratrix of the decedent's estate. The Minnesota Supreme Court held that because Peickert had not placed his medical condition in controversy in the second action, under Rule 35.03 there was no waiver of the privilege in that lawsuit. Id. at 786. Therefore, the plaintiff could not examine the medical records, and they could not be admitted into evidence. Id. at 787.
 
 
 24
 Although we agree that Richards did not in the present lawsuit waive the privilege under Rule 35.03 or under the holding in Knudsen, we must disagree with Cerro Gordo that this necessarily means that no other waiver of the privilege could have possibly occurred in this instance. Our conclusion is based upon two separate propositions. First, we believe that more than one type of waiver can occur in a single lawsuit. Cerro Gordo admits that privileged information can be introduced into evidence under either Rule 35.03 or through consent of the patient. We see no reason why both of these waivers cannot occur in a single lawsuit. Second, we find that a waiver of the privilege can occur when there is a public disclosure in a prior lawsuit of the privileged information. Both propositions are illustrated by the Minnesota Supreme Court's decision in State v. Clark, 296 N.W.2d 372 (Minn.1980).
 
 
 25
 In Clark, the defendant's wife testified at trial concerning certain conversations she had had with him. Even though basically the same information had been disclosed by the wife at a prior trial without objection by the defendant, at this proceeding the husband objected to the testimony, claiming that it was protected by the marital privilege. The Minnesota Supreme Court held that the privilege had been waived in the second proceeding because of the prior disclosure of the information in open court during the first trial. The court stated that "[o]nce a 'secret' is publicly disclosed, it serves little purpose in not allowing it to be restated. At the very least, it must be said that the investigation of truth outweighs the policies against restatement of information already public." Id. at 376 (footnote omitted).
 
 
 26
 In Clark, the first event that triggered a waiver of the privilege occurred when the defendant failed to object in the first trial to the introduction into evidence of the privileged information. The second occurred once the information was made public through the testimony of the defendant's wife. Once the information was made public, it was deemed to be a waiver of the privilege in future proceedings of the information already publicly disclosed. Id. at 376.
 
 
 27
 Likewise, in this instance we find that there were two separate events that triggered two different waivers of the privilege. The first type of waiver occurred when the conciliation court action was brought and Richards placed his medical condition in issue; under Rule 35.03, this waiver lasted only for the duration of the conciliation court proceeding. The second waiver occurred when the privileged information was ultimately disclosed in open court in that same lawsuit; like the waiver in Clark, this waiver should extend to future lawsuits. Our finding that this second type of waiver occurred is based on the following reasons.
 
 
 28
 First, the Minnesota Supreme Court in the context of the marital privilege has recognized that a disclosure of privileged information in open court in a prior lawsuit constitutes a waiver of that privileged information for purposes of future lawsuits. Id. We see no reason why the Minnesota Court would not extend the reasoning of Clark to cases involving the physician-patient privilege. Kundsen is not in conflict with our conclusion because the facts in Knudsen are clearly distinguishable from the facts in this case and from the facts in Clark. In Knudsen, the only event that could have triggered the waiver was the fact that a party had voluntarily placed his medical condition in issue. There is no indication in Knudsen that in the earlier lawsuit there was any disclosure in open court of the privileged information. The additional triggering event of a public disclosure of the privileged information, which occurred in this instance and in Clark, was not present.
 
 
 29
 Second, we find that Rule 35.03, in and of itself, presents no barrier to applying the reasoning in Clark to cases involving the medical privilege. We conclude that Rule 35.03 was not intended to be a limitation on the instances in which a waiver of the physician-patient privilege can occur. The history behind the rule bears this point out. Prior to the adoption of Rule 35.03, the law in Minnesota had been firmly established that the bringing of a lawsuit by the patient (unless brought against the doctor for malpractice) or merely the testimony of the patient at trial concerning the injuries sustained or the treatment received (unless the testimony related to statements made to the doctor or it questioned the correctness of the treatment received) was not a waiver of the medical privilege by the patient. See Polin v. St. Paul Union Depot Co., 159 Minn. 410, 199 N.W. 87, 88 (1924). Thus, a patient could bring a lawsuit for personal injuries and even testify at trial as to those personal injuries without being deemed to have waived the physician-patient privilege. Id.
 
 
 30
 The abuses that resulted from this development in the law caused the Minnesota Supreme Court on one occasion to disparagingly remark that "[i]nstead of accomplishing the purpose for which [the privilege] was originally intended, the privilege has been so far corrupted today that it is used, at least in personal injury cases, for the most part for the suppression of truth." Nelson v. Ackermann, 249 Minn. 582, 83 N.W.2d 500, 506 (1957) (cited in the Advisory Committee Note to Rule 35.03). The ability of a plaintiff suing for personal injuries to assert the privilege with regard to matters relating to the injuries was viewed by the Minnesota Supreme Court as an "unfair advantage" to the plaintiff patient. 83 N.W.2d at 507.
 
 
 31
 Rule 35.03 was promulgated a decade after Nelson v. Ackermann was decided. Its purpose appears to have been to remove the unfair advantage which had existed in the past by providing that a party who voluntarily places his medical condition in issue waives the privilege. Considering this historical background, it is doubtful that Rule 35.03 was meant to restrict the instances in which the medical privilege would be waived. If anything, it was intended to enlarge the number of cases in which the waiver would be judged to have occurred. Accordingly, Rule 35.03 in and of itself stands as no impediment to applying the Minnesota Supreme Court's reasoning regarding the waiver of the marital privilege to a waiver of the privilege in the medical privilege setting.
 
 
 32
 Finally, there is persuasive authority directly supporting the proposition that a waiver of the medical privilege occurs once there has been a public disclosure in an earlier lawsuit of the otherwise privileged information.
 
 
 33
 A waiver at a former trial should bar a claim of the [physician-patient] privilege at a later trial, for the original disclosure takes away once and for all the confidentiality sought to be protected by the privilege. To enforce it thereafter is to seek to preserve a privacy which exists in legal fiction only.
 
 
 34
 8 J. Wigmore, Evidence Sec. 2389(4) (McNaughton rev. 1961) (emphasis in original). A number of courts have also reached this conclusion. See, e.g., State v. Mincey, 141 Ariz. 425, 687 P.3d 1180, cert. denied, 469 U.S. 1040, 105 S.Ct. 521, 83 L.Ed.2d 409 (1984); In re Whiting, 110 Me. 235, 85 A. 792 (1913); People v. Bloom, 193 N.Y.1, 85 N.E. 824 (1908); McKinney v. Grand St., P.P. & F.R. Co., 104 N.Y. 352, 10 N.E. 544 (1887). But see Maryland Casualty Co. v. Maloney, 119 Ark. 434, 178 S.W. 387 (1915); Burgess v. Sims Drug Co., 114 Iowa 275, 86 N.W. 307 (1901).
 
 
 35
 In view of the foregoing authority, we believe that the Supreme Court of Minnesota would hold that Richards had waived the privilege as to communications between Dr. Guerrero and himself that were made public in the prior proceeding.
 
 B
 
 36
 Cerro Gordo further argues that even if there was a waiver of the privilege, the transcript of Dr. Guerrero's testimony should not have come into evidence inasmuch as it was inadmissible hearsay. Implicit in Cerro Gordo's argument is the fact that if a waiver of the privilege did indeed occur, Dr. Guerrero should have been called to testify at trial. The record indicates, however, that Cerro Gordo objected at trial to the live testimony of Dr. Guerrero--even though the insurance companies were willing to have Dr. Guerrero take the stand. Cerro Gordo cannot have its cake and eat it too. It cannot claim on appeal that Dr. Guerrero should have been permitted to testify if at trial it objected to any live testimony by Dr. Guerrero. We therefore find that Cerro Gordo waived any hearsay objection it may have had to the introduction of the transcript at trial.
 
 III
 
 37
 The district court permitted the insurance companies to call Richards to testify at trial, even though Richards had made it known that he would invoke his fifth amendment privilege against self-incrimination. Upon taking the stand, Richards testified only to his name, address, and profession, invoking the privilege in response to other questions which were asked. Cerro Gordo asserts that the district court erred in allowing defendants to call Richards for the sole purpose of having the jury hear him invoke the fifth amendment privilege. We disagree.
 
 
 38
 The fifth amendment provides that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself." It is now well settled that the privilege is also available in civil proceedings. McCarthy v. Arndstein, 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924). The privilege "applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it. The privilege protects a mere witness as fully as it does one who is also a party defendant." Id.[6]
 
 
 39
 Although the privilege applies in both civil and criminal proceedings, the Supreme Court has viewed the assertion of the privilege differently depending on whether a civil or criminal proceeding is involved. In criminal proceedings, the prosecution is prohibited from commenting on the accused's silence, and the trial court is forbidden from instructing the jury that the defendant's invocation of the privilege may be used in the jury's consideration of the guilt or innocence of the defendant. Griffin v. California, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). By contrast, the Supreme Court in Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1976), stated "that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."
 
 
 40
 The question remains regarding the extent to which a nonparty's invocation of the fifth amendment privilege may be made known to the jury in civil cases. This court touched upon this question in Rosebud Sioux Tribe v. A & P Steel, Inc., 733 F.2d 509 (8th Cir.), cert. denied, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984).
 
 
 41
 In Rosebud, A & P Steel entered into a contract with the Rosebud Sioux Tribe to develop an irrigation system on the Tribe's land. Allegations of fraud, corruption, and nepotism arose with regard to the project. The Tribe sued A & P for fraud, conspiracy, breach of contract, and breach of warranties arising out of the contract. The Tribe took the deposition of Richard Long Dog, the chairperson of a corporation that managed the Tribe's lands. Long Dog's deposition testimony contradicted allegations contained in the Tribe's complaint. At trial, the district court refused to allow the Tribe to call Long Dog to the stand to have him invoke this fifth amendment privilege in the presence of the jury. The court, though, permitted A & P to read Long Dog's deposition testimony into evidence.
 
 
 42
 On appeal, this court held that it was improper for the trial court not to allow the Tribe to call Long Dog to the stand to have him invoke the fifth amendment before the jury. Id. at 523. The court stated that in certain instances "a party may call a witness to the stand even when that witness has made known an intention to invoke the Fifth Amendment." Id. at 522.[7] Of special concern to the court was the unfair advantage that A & P had gained by being permitted to use the deposition testimony. Id. at 522-23. Three factors were important to the court in reaching this conclusion: (1) Long Dog was a key figure in the activities at issue in the case; (2) his deposition testimony was most probably perjured; and (3) through unfair manipulation of the rules of evidence A & P was able to introduce testimony favorable to its side and was also able to effectively prevent any cross-examination of that evidence by the Tribe. Id. The court concluded that by permitting the Tribe to call Long Dog to have him invoke his fifth amendment privilege before the jury, the Tribe would be able to counteract the unfair advantage that A & P had gained. Id. at 522.
 
 
 43
 The court in Rosebud declined to announce any blanket rule legitimizing all attempts to require a witness to invoke the privilege in the presence of the jury. Id. at 523. Likewise, we announce no such rule in this case, preferring instead to consider these questions on a case-by-case basis.
 
 
 44
 Under the circumstances here present, we agree with the district court that it was appropriate to permit the insurance companies to call Richards to the stand for the purpose of having him invoke the privilege in the jury's presence.
 
 
 45
 First, we find that the fact that Richards may not be presently involved with Cerro Gordo in an official capacity presents no bar to requiring him assert the privilege before the jury.[8] In that regard, this case is analogous to Brink's Inc. v. City of New York, 717 F.2d 700 (2d Cir.1983), and RAD Servs., Inc. v. Aetna Casualty & Sur. Co., 808 F.2d 271 (3d Cir.1986), wherein the Second and Third Circuits, respectively, held that it was permissible to allow the invocation of the privilege to be made known to the jury when it is invoked by a non-party who was a former employee of a company a party to the litigation. Richards, as a former member of Cerro Gordo, stands in a position similar to the non-party ex-employees in those cases. Moreover, any concerns that Richards would invoke the privilege solely for the purpose of harming Cerro Gordo are not present here.[9] There is reason to believe that Richards still retains some loyalty to Cerro Gordo. See Heidt, supra, note 9. These suits were brought in the name of Cerro Gordo when Richards was still a controlling member of the charity. Although it is true that Richards is not presently listed as a director or voting member of the charity, there is some question whether he retained some control over the charity and whether his resignation as a voting member after these suits were filed was not purely a matter of litigation strategy. There is no evidence that would lead one to believe that Richards would assert the privilege solely to harm Cerro Gordo's chances of success in this litigation.
 
 
 46
 Second, even if Richards retained some ties with Cerro Gordo, and could still have possibly benefited, either directly or indirectly, from a verdict in Cerro Gordo's favor, we hardly think that making it known to the jury that Richards invoked the privilege made the invocation too costly. See Baxter v. Palmigiano, 425 U.S. at 316-20, 96 S.Ct. at 1557-59; Lefkowitz v. Cunningham, 431 U.S. 801, 808 n. 5, 97 S.Ct. 2132, 2137 n. 5, 53 L.Ed.2d 1 (1977). The fact that Richards chose to invoke the privilege was only one of a number of factors that the jury had to consider in determining whether a fraud had been committed. Id. There was other evidence presented at trial that Richards sought to perpetrate a fraud on the insurance companies.
 
 
 47
 Third, Richards is also a key figure in this case. His actions form the very basis of the affirmative defense of fraud. If anyone knew whether there was an intent to commit a fraud, it was Richards. Hearing Richards invoke the privilege informed the jury why the parties with the burden of proof, i.e., the insurance companies, resorted to less direct and more circumstantial evidence than Richards' own account of what had occurred. See Heidt, supra, note 9, at 1123-24. Otherwise, the jury might have inferred that the companies did not call Richards to testify because his testimony would have damaged their case. Id. at 1124.
 
 
 48
 Finally, we find that the probative value of the evidence substantially outweighed any danger of unfair prejudice to Cerro Gordo. Fed.R.Evid. 403. Evidence is probative if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. In order for evidence to be admissible under Rule 401, it need not necessarily prove that a fact of consequence exists; it need only make it more probable that that fact exists. Under the particular circumstances of this case, Richards' invocation of the privilege made it more probable that Richards had committed the acts in question. In addition, this evidence was not unduly prejudicial in the sense of creating "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee Note, Fed.R.Evid. 403. This evidence was not unduly emphasized by the companies when considered in relation to other key evidence introduced at trial. Also, by no means was it ever suggested in any way at trial that the jury should base its entire decision solely on this evidence, nor does it appear likely that the jury did so. In the light of the foregoing factors, we hold that it was proper to call Richards to the stand to have him assert his fifth amendment privilege in the presence of the jury.
 
 IV
 
 49
 Cerro Gordo argues that the district court erred in admitting into evidence certain purported "other acts" of Richards pursuant to Rule 404(b) of the Federal Rules of Evidence.[10] This court has held that
 
 
 50
 [e]vidence of such other acts is admissible when it is relevant to an issue in question other than the character of the defendant, there is clear and convincing evidence that the defendant committed the prior acts, and the potential unfair prejudice does not substantially outweigh the probative value of the evidence.
 
 
 51
 United States v. Galyen, 798 F.2d 331, 332 (8th Cir.1986). The district court is given wide discretion as far as the admission of such evidence. United States v. Simon, 767 F.2d 524, 526 (8th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 545, 88 L.Ed.2d 474 (1985). We will reverse a district court's determination "only when the evidence admitted has no bearing on any issue involved." Id.
 
 
 52
 * The insurance companies were permitted to introduce evidence of the numerous HIP policies previously owned by Wilson and the other AD & D policies that Wilson owned at the time of her death.
 
 
 53
 At one time, Wilson was insured under forty-six HIP policies. Upwards of $700,000 was collected on these policies. The proceeds did not go directly to Wilson, but instead into certain trusts controlled by Richards. At the very least, the HIP policies illustrated Richards' control over Wilson. There is evidence that Richards was involved in the procurement of the policies, the payment of the premiums, and the handling of the claims with the insurance companies. Ultimately, he benefited from the proceeds of the policies. The picture painted by the evidence is that Richards was a de facto procurer and beneficiary of the HIP policies. This evidence was thus properly admissible as evidence of whether Wilson was merely a pawn or instrumentality of Richards.[11]
 
 
 54
 We also find that the AD & D policies were properly admitted into evidence. There was a build-up of the accidental death coverage, with some thirty certificates in effect that provided in excess of $3.5 million coverage on Wilson's life at the time she was murdered. It is not hard to envision that an individual might murder another to recover insurance proceeds resulting from the other's death. Hence, it was altogether reasonable for the district court to admit the AD & D policies as evidence of the fact that Richards had a motive to kill Wilson.
 
 B
 
 55
 The district court permitted the insurance companies to introduce evidence of an incident that occurred only two months before the murder. Richards' home had an attached garage and an ADT smoke alarm system. On March 14, 1982, the alarm was activated. When fire department personnel arrived, they found a haze of exhaust fumes in the house. Richards showed the firemen to the garage, where Wilson was found in the back seat of a taxicab. The garage door was closed, and there were strong fumes within the building. Wilson was semi-conscious. There were contused areas on her head that made it appear as though she had been struck. Her first words after the incident--which she repeated several times thereafter--were, "Do you think my brother is trying to kill me?" Richards' version of the incident was that he was taking Wilson out to dinner. He had started the cab but then had to go back inside to get his trip sheet.
 
 
 56
 At the hospital, Wilson repeated her statement to the police about her brother trying to kill her. Wilson was initially cooperative with the police, but once Richards told her that the police were trying to get him for drunk driving and that she should not answer their questions, she became hostile and started screaming at the police officers.[12]
 
 
 57
 We find that evidence of the carbon monoxide incident, was, at the very least, properly admissible as evidence of Richards' control over Wilson. Wilson was obviously worried that Richards was trying to kill her through carbon monoxide poisoning. Richards, though, was able to keep her from cooperating with the police in further investigating the matter despite her obvious fear for her own safety. A police officer who investigated the incident testified at trial that Richards "appeared to have some type of control over [Wilson] * * *."
 
 C
 
 58
 The district court allowed Gerald Gross, a former employee in one of Richards' businesses, to testify that on the night before his testimony at the trial he received a telephone call from an anonymous caller who told Gross that if he testified he would be dead.
 
 
 59
 Evidence of a party's attempt to influence a prospective witness' testimony is relevant to show the party's consciousness of guilt. United States v. Gonsalves, 668 F.2d 73, 75 (1st Cir.), cert. denied, 456 U.S. 909, 102 S.Ct. 1759, 72 L.Ed.2d 168 (1982). Such evidence is admissible provided its probative value substantially outweighs its prejudicial effect. United States v. Bongard, 713 F.2d 419, 421 (8th Cir.1983) (per curiam). The standard of review is whether the district court abused its discretion in admitting it into evidence. United States v. Poston, 727 F.2d 734, 739 (8th Cir.), cert. denied, 466 U.S. 962, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984).
 
 
 60
 We find no abuse of discretion by the district court in admitting the testimony of the threatening phone call. Though the caller did not reveal his name, it is obvious from the circumstances that no one but Richards had the motive to frighten Gross into fleeing or testifying falsely.[13]
 
 V
 
 61
 Prior to trial, Cerro Gordo sought access to the Hennepin County investigative files pertaining to Wilson's death. The Hennepin County Attorney denied access to the files on the ground that the information was privileged. Cerro Gordo and others then brought an action in Minnesota state court to gain access to the investigative files under the Minnesota Government Data Practices Act, Minn.Stat. Secs. 13.01-13.90.
 
 
 62
 Before the completion of the state court action, this case was called to trial. Cerro Gordo moved to stay the proceedings until the state court had ascertained what information in the investigative files would be made available. Though the motion was denied, the district court did conduct an in camera inspection of some of the investigative files. The court ruled that only limited portions of the files could come into evidence. The court further determined that the Minneapolis police officers involved in the investigation of the homicide would be limited in their testimony at trial to their eyewitness observations concerning the crime scene, the arrest and release of Richards, and the search of Richards' and Wilson's house. The court did not permit the officers to testify regarding the results of their investigative testing.
 
 
 63
 Sometime after the conclusion of this trial, the state court ruled that certain investigative files could be disclosed to Cerro Gordo. Cerro Gordo argues that the district court abused its discretion by refusing to stay the proceedings in this case pending the state court's decision on what evidence would be made available to them. It also alleges that the district court abused its discretion by not conducting a meaningful analysis of the issue. Cerro Gordo thus requests us to grant a new trial on the issue of whether Richards murdered Wilson. We decline to do so. We have not been informed as to the contents of the newly released files. There is no indication that the files contain any new information that could plausibly affect the outcome of the case should a new trial be granted. See Rosebud, 733 F.2d at 523. Cerro Gordo asserts that based on what is contained in the files, it may be forced to move for a new trial under Fed.R.Civ.P. 60(b)(2). Be that as it may, at this juncture no sufficient basis exists for granting a new trial.
 
 VI
 
 64
 Lastly, Cerro Gordo argues that the evidence was insufficient to support the jury's special verdict. As was mentioned earlier, the defendant insurance companies bore the burden of establishing three facts in order to deny coverage to Cerro Gordo: (1) that Wilson was a mere instrumentality of Richards; (2) that Richards intended to kill Wilson at the time the insurance policies were procured; and (3) that Richards killed Wilson as part of a plan to obtain the insurance proceeds. See New England Mut. Life Ins. Co. v. Null, 605 F.2d 421 (8th Cir.1979). By special verdict, the jury found for the defendants on each of these questions.
 
 
 65
 Our review of the jury's findings is limited. "On appeal, we will overturn a jury verdict only where the evidence is susceptible to no reasonable inferences sustaining it." Cashman v. Allied Prod. Corp., 761 F.2d 1250, 1253 (8th Cir.1985). Evidence is to be considered in the light most favorable to the verdict. Zoll v. Eastern Allamakee Community School Dist., 588 F.2d 246, 250 (8th Cir.1978). The prevailing party is to be given the benefit of all reasonable inferences that can be drawn from the evidence, and factual disputes are to be decided in favor of the verdict. Id.
 
 
 66
 * The jury found that Wilson was merely a pawn in Richards' scheme to obtain AD & D insurance benefits. We hold that this finding is supported by the evidence presented at trial.
 
 
 67
 There is evidence that Wilson had little knowledge of her finances, particularly the life insurance issued under her name. She appears to have trusted Richards to handle her financial affairs. For example, with regard to the HIP policies in her name, Richards and not Wilson was involved in the procurement of the policies, the payment of the premiums, and the handling of the claims with the insurance companies. The Krugerrands incident and the carbon monoxide incident also indicate Richards' control over Wilson--control that seems to have extended beyond just the procurement of the insurance policies.
 
 
 68
 In addition, there is the fact that from 1977 through 1981 Wilson gave $700,000 to Richards' churches and charities. She even gave her house to one of his churches, leaving her with no place to live. Although net receipts during the 1970's from the HIP policies exceeded half a million dollars, according to the probate inventory Wilson died nearly destitute. The only other generosity on her part revealed in the record was that she gave gifts of clothing to nieces and nephews on birthdays and at Christmas. Although her gifts to Richards' churches and charities could conceivably be attributed to love for him, or to the fact that she had a genuine interest in his churches and charities, the jury could logically infer that this behavior more likely reflected the fact that Richards had significant control over Wilson's financial affairs and sought to use this control for his own ends. The jury could reasonably infer that Richards had this degree of control over Wilson as a result of her weakened physical and mental condition. As recounted earlier, Wilson was frequently hospitalized for psychiatric and physical problems. She had a history of suicide attempts or threats of suicide, was continually dependent on a number of tranquilizers and sleeping pills to relieve her anxiety and depression and help her sleep, and at times she appeared incapable of performing even simple tasks. It is reasonable to infer from the facts presented in this case that her weakened state made her more vulnerable to being manipulated and controlled by someone else.
 
 
 69
 We thus hold that there was sufficient evidence for the jury to conclude that Wilson was a mere instrumentality of Richards.[14]
 
 B
 
 70
 "[A] life insurance policy is void ab initio when it is shown that the beneficiary thereof procured the policy with a present intention to murder the insured." New England Mut. Life Ins. Co. v. Null, 605 F.2d at 424. Before addressing the question whether the jury's finding that Richards intended to kill Wilson at the time the policies were procured is supported by the evidence, we must first determine the proper definition of "procured." Cerro Gordo and defendant companies are in dispute over this point. The companies argue that the policies were "procured" at the time they were renewed, citing Hauer v. Integrity Mut. Ins. Co., 352 N.W.2d 406, 408 (Minn.1984), wherein the Minnesota Supreme Court stated that "upon renewal an entirely new and independent contract of insurance is created." Defendant companies argue that since renewal of the policy creates an entirely new contract, then the time of last renewal is the time when the insurance should be considered to have been procured.
 
 
 71
 Cerro Gordo distinguishes Hauer by saying that the case does not apply when the policy is automatically renewable at the option of the insured. Because, as Cerro Gordo argues, the policies were automatically renewable, the renewals simply extended the original contract. Accordingly, the time of procurement occurred when the policies were first taken out, and not when they were renewed.
 
 
 72
 We conclude that we need not address whether Hauer applies in instances where the policy is automatically renewable at the insured's option. First, the question is moot with regard to defendant North American inasmuch as the jury found that Richards' intent to kill Wilson was formed at the time the North American policies were first taken out. As we will discuss later, this finding is sufficiently supported by the evidence. With regard to Fireman's Fund, the master policy clearly provided that the company had the option to "cancel this Policy at any time by written notice delivered to the Policyholder." In the light of this explicit language, it does not appear that the policy was automatically renewable. Accordingly, a new contract was formed upon renewal of the policy. Under the holding in Hauer, the time of procurement thus occurred when the policy was last renewed.
 
 
 73
 With regard to the sufficiency of the evidence, Cerro Gordo argues that no intent to kill Wilson ever existed on Richards' part, regardless of when the policies are deemed to have been procured. The jury, though, found that Richards' intent to kill Wilson existed at the time the two North American policies were originally purchased on December 16, 1977, and June 25, 1979. It also found that the fraudulent intent existed at the time of the last renewal of the Fireman's Fund policy on June 1, 1981. We conclude that such findings were supported by the evidence.
 
 
 74
 Dr. Guerrero's testimony revealed that Richards had made several unveiled remarks to him about killing Wilson. Richards made these statements in 1977--well enough within the relevant time period to raise an issue for the jury as to whether Richards had an intent to kill Wilson at the time that the policies were procured. This evidence of Richards' intent to kill his sister was not contradicted or weakened by any other evidence presented at trial. If anything, it was reinforced by subsequent events, especially the large build-up of AD & D insurance--in which entities controlled by Richards were designated as beneficiaries--and by the unusual circumstances surrounding Wilson's death. We therefore hold that the jury's finding that Richards had an intent to kill Wilson at the time the policies were procured finds support in the evidence.C
 
 
 75
 The jury found by special verdict that Richards killed, or caused to have killed, Wilson. We conclude that this finding was rationally based.
 
 
 76
 First, Richards had an obvious motive to kill his sister. At the time of Wilson's death, AD & D insurance in excess of $3.5 million had been taken out on Wilson's life. The designated beneficiaries of the AD & D policies were a variety of entities created and controlled by Richards at the time of her death. Richards thus had much to gain by Wilson's death.
 
 
 77
 Second, there is Richards' especially suspicious behavior around the time that Wilson was believed to have been murdered. Wilson was to fly to Phoenix, Arizona, to visit relatives on May 10 and to return the next day in order to meet with her lawyer on May 12. Wilson did not leave for Phoenix on May 10 and was not seen alive thereafter. Richards' behavior after May 10 is difficult to explain unless it was he who was involved in the killing. For instance, after Wilson's death was discovered, a search of the house Richards shared with Wilson revealed that Wilson's suitcase for her trip to Arizona was still in the living room. Her purse containing her driver's license, checkbook, and cash was still in the closet. Between the time Wilson was supposed to return and the time the body was found, Richards had called relatives in Phoenix and was explicitly told by them that they had not seen her. Despite these obvious indications that Wilson was not in Phoenix visiting relatives as purportedly planned, Richards kept acting in the presence of others as if she were. Even after the body was discovered and Richards was first confronted by the police, Richards still suggested that Wilson was visiting relatives in Arizona. No legitimate explanation for Richards' behavior was presented, and the jury could logically conclude that Richards somehow knew of what had happened to his sister and was making a concerted effort to conceal that fact from others.
 
 
 78
 In addition, around the time that Wilson was believed to have been killed, Richards suddenly started visiting relatives he had seldom or never visited in the past. Before the police informed Richards of Wilson's death, Richards had already made several photocopies of the notes on the refrigerator door that stated that Wilson was supposed to fly to Phoenix, Arizona, on May 10, with a return flight the next day. After the notes were confiscated, he then sent these photocopies to various people, including relatives in Phoenix. The logical inference to be drawn from this behavior is that Richards was trying to create an alibi for himself.[15]
 
 
 79
 Finally, as mentioned before, Richards had previously expressed a desire to kill his sister. This statement takes on heightened importance in view of Richards' obvious motive to kill Wilson and the suspicious circumstances surrounding her death.
 
 
 80
 We are mindful that the foregoing evidence might possibly prove to be insufficient to convict Richards in a criminal proceeding.[16] This is a civil case, however, with a substantially lesser burden of proof, and we conclude that the jury could rationally conclude that Richards killed Wilson, or else had someone else kill her for him. We therefore hold that the evidence is sufficient to support the jury's special verdict.
 
 VI
 
 81
 In conclusion, we hold that the transcript of Dr. Guerrero's prior testimony at the conciliation court proceeding was properly admitted into evidence; that it was proper to allow the defendants to call Richards to the stand to have him invoke his fifth amendment privilege; and that the district court did not err in admitting evidence of certain "other acts" by Richards. Moreover, with regard to the now-released investigative files, we decline to grant a new trial since there is no indication at this time that the files contain any new evidence which would have any affect on the outcome of a second trial. Lastly, we find that the evidence adduced at trial sufficiently supported the jury's special verdict.
 
 
 82
 The judgments dismissing Cerro Gordo's claims are affirmed.
 
 
 
 *
 The HONORABLE DAVID R. HANSEN, United States District Judge for the Northern District of Iowa, sitting by designation
 
 
 [1]
 The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota
 
 
 [2]
 This case involves only three of the twenty-six accidental death insurance policies obtained, only three of the approximately fourteen lawsuits relating to the policies, and only $450,000 of the approximately $3.5 million ultimately in issue. The remaining lawsuits are generally being stayed pending the outcome of this appeal
 
 
 [3]
 The present directors and voting members of the charity are James Reichert and Richard Keseley. Richards resigned as director of the charity in February 1982 and as a voting member in June 1983. At the time these suits were filed by Cerro Gordo, however, Richards still had full control of the charity
 
 
 [4]
 The district court's analysis of this question can be found in Cerro Gordo Charity v. Fireman's Fund Ins. Co., 623 F.Supp. 877 (D.Minn.1985)
 
 
 [5]
 As noted by the district court, the language in Sec. 595.02 subd. 1(d) following the semicolon is inapplicable in this instance since the punctuation and plain meaning of the statute clearly indicate that this particular language pertains only to suits occurring after the death of the patient. 623 F.Supp. at 879 n. 3. The patient in this instance is very much alive, as evidenced by the briefing he has personally provided us on this question of statutory construction
 
 
 [6]
 The extension of the privilege to civil cases was necessary to accomplish the purpose of the privilege. See Note, Use of the Privilege Against Self-Incrimination in Civil Litigation, 52 Va.L.Rev. 322, 323 (1966). If this were not the case, a witness forced to testify in a civil case could possibly be later convicted in a criminal proceeding with that very testimony. Id. See, e.g., United States v. Epstein, 152 F.Supp. 583 (E.D.Pa.1957). Moreover, even if the testimony could not be used as evidence in a criminal proceeding, the testimony may still be employed to discover other evidence that could be used against the individual in a criminal prosecution. Note, supra. See, e.g., Counselman v. Hitchcock, 142 U.S. 547, 564, 12 S.Ct. 195, 198, 35 L.Ed. 1110 (1892)
 
 
 [7]
 Of the two federal circuits that have addressed the question, both are essentially in agreement with this circuit on this point. See RAD Servs, Inc. v. Aetna Casualty & Surety Co., 808 F.2d 271 (3d Cir.1986); Brink's Inc. v. City of New York, 717 F.2d 700 (2d Cir.1983)
 
 
 [8]
 Richards resigned as director of the charity in February 1982, and as a voting member in June 1983
 
 
 [9]
 See Note, Adverse Inferences Based on Non-Party Invocations: The Real Magic Trick in Fifth Amendment Civil Cases, 60 Notre Dame L.Rev. 370, 387 (1985), which argues that it should be improper to permit the trier of fact to draw adverse inferences from a non-party's invocation of the privilege when at the time of trial that individual stands in no special relationship with a party in the lawsuit. The author states that, among other things, a non-party witness may purposefully assert the privilege solely to discredit a party that they have fallen into disfavor with (e.g., an ex-employee asserting the privilege to hurt a former employer). Id. at 386. For the countervailing argument, see RAD, 808 F.2d at 275-76; Heidt, The Conjurer's Circle--The Fifth Amendment Privilege in Civil Cases, 91 Yale L.J. 1062, 1119 n. 214 (1982)
 
 
 [10]
 Rule 404(b) provides:
 (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 [11]
 Cerro Gordo has also contested the introduction into evidence of the so-called Krugerrands incident. Wilson had an insurance policy on 207 gold Krugerrands that she apparently owned. Evidence was introduced at trial that an inventory of the coins had been conducted. Even though she apparently owned the valuable coins, Wilson was not involved in the inventory or even expressed any concern as to how the coins were being inventoried. Instead, the inventory was conducted solely by Richards and one other individual. We find this evidence admissible inasmuch as it went to the issue of Richards' involvement in, and control over, Wilson's financial affairs
 
 
 [12]
 Only weeks prior to the incident, Richards had taken out six policies of common carrier accidental death insurance on Wilson's life. Richards, however, was not charged or arrested in connection with the incident
 
 
 [13]
 The district court also admitted evidence concerning the churches, charities, and corporations with which Richards was involved. Cerro Gordo argues that the only reason for presenting evidence of Richards' business and religious entitites was to cast suspicion on Richards' character. We find, however, that the evidence of these various entities was relevant as evidence of Richards' plan or scheme and to show that Richards was indirectly a de facto beneficiary under the policies
 
 
 [14]
 There was other evidence adduced at trial indicating Richards' control over, or potential to control Wilson. Constraints of time and space, however, counsel us to refrain from elaborating further on this point
 
 
 [15]
 Despite these visits, however, Richards still had the opportunity to kill Wilson, or to have her killed, during the time period in which she is believed to have been murdered
 
 
 [16]
 As of this time, no criminal charges have been brought against Richards for the murder of Wilson