John W. **KONTOS**, Plaintiff,

v.

Cheryl J. **KONTOS**, Defendant.

No. IP 95–1733–B/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

May 16, 1997.

Richard L. McOmber, Harrison & Moberly, Indianapolis, IN, for Plaintiff.

John D. Boren, Boren & Oliver, Martinsville, IN, for Defendant.

## ENTRY DISCUSSING GRANT OF SUMMARY JUDGMENT

BARKER, Chief Judge.

This suit began as an interpleader action brought by Prudential Insurance Company of America ("Prudential") to determine whether Cheryl J. Kontos or John W. Kontos is entitled to the proceeds of a life insurance policy ("the Policy") taken out by the decedent, Gregory Kontos. Prudential tendered the funds from that policy to the Clerk of this Court and the parties subsequently stipulated to Prudential's dismissal and discharge from liability in this lawsuit. Thereafter, John W. Kontos ("Plaintiff") filed an amended complaint for damages on the grounds that he, rather than Cheryl J. Kontos ("Defendant"), is entitled to the proceeds of the Policy.

Plaintiff claims that Defendant participated in the murder of her husband and, consequently, that as a matter of equity, she should be barred from any receipt of the Policy's proceeds and that, as the contingent beneficiary, he should accede to the proceeds. Defendant denies that she was in any way involved in her husband's death.[1] Defendant has moved for summary judgment, pursuant to Federal Rule of Civil Procedure 56, on the grounds that Plaintiff has not

presented enough evidence to make out a prima facie case that Defendant was involved in her husband's murder. The question before the Court is whether, based on the material proffered as evidence, a jury could reasonably conclude that Defendant was in fact involved in her husband's death. For the reasons that follow, we find that Plaintiff has not presented sufficient evidence of Defendant's involvement in her husband's murder to make out a prima facie case and, consequently, grant Defendant's motion.[2]

### I. Statement of Facts

Gregory Kontos ("the Decedent") was a member of the United States Army and was stationed at Ft. Sam Houston in San Antonio, Texas. The Decedent's Policy is in the amount of $200,000 and lists the Decedent's wife, Cheryl J. Kontos, as the primary beneficiary and the Decedent's brother, John W. Kontos, as the contingent beneficiary of the Policy.

On October 28, 1994 Gregory was murdered while visiting Indianapolis, Indiana. Gregory's body was found in a rental car parked in front of a strip bar in or around Lawrence, Indiana. He had died of four gunshot wounds from a 9-millimeter semi-automatic pistol.

Defendant denies that she was in any way involved in her husband's murder. In her deposition, Defendant testified as to the following: Upon arriving in Indianapolis, the Decedent stayed at the Airport Ramada Inn. (Def's Depo., p. 127–28) On the evening of October 28, Defendant went to her husband's room at the Inn and invited him to accompany her and her sister, Cherie J. Klawun, to dinner at a nearby Denny's Restaurant. (*Id.*, 126–30). Defendant drove the three of them to the Denny's Restaurant in a car that the Decedent had rented. (*Id.*, p. 128) On their way to dinner, Defendant and her husband had an argument. (*Id.*, pp. 130–32)

---

1. Plaintiff has made no mention as to whether the State engaged in a criminal investigation and/or prosecution of Defendant in connection with her husband's murder; we assume neither has occurred. While not controlling in a civil case, a pending criminal indictment or conviction of Defendant would nonetheless change the landscape of this case significantly.

2. The Court also denies as moot Plaintiff's April 23, 1997 Motion fo File Supplemental Authority and Defendant's February 18, 1997 Motion to Strike.

Defendant testified that, as a result of the argument, the three of them did not eat at Denny's but instead drove back to the Ramada Inn, where Defendant and her sister allegedly parted company from the Decedent and drove away in Defendant's car. (*Id.,* pp. 131–32) Defendant testified that their parting was the last time that she saw or spoke to her husband. (*Id.,* p. 131)

## II. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. Proc. 56(c). While the burden rests squarely on the party moving for summary judgment to show "that there is an absence of evidence to support the nonmoving party's case," *see Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986), the nonmoving party responding to a properly made and supported summary judgment motion still must set forth facts showing that there is a genuine issue of material fact and that a reasonable jury could return a verdict in its favor. *See Wolf v. City of Fitchburg,* 870 F.2d 1327, 1329 (7th Cir.1989); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). Denials contained in the pleadings or bald allegations that an issue of fact exists is insufficient to raise a factual issue. *See Shacket v. Philko Aviation, Inc.,* 681 F.2d 506, 513 n. 8 (7th Cir.1982), *rev'd on other grounds,* 462 U.S. 406, 103 S.Ct. 2476, 76 L.Ed.2d 678 (1983). Furthermore, a genuine issue of fact cannot be based merely on speculation. "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Tyler v. Runyon,* 70 F.3d 458, 469 (7th Cir.1995) (quoting *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 932 (7th Cir.1995)). In order for an issue to be "genuine," the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby,Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986);

*Scherer v. Rockwell Intern. Corp.,* 975 F.2d 356, 360 (7th Cir.1992). In other words, the moving party has the initial burden of showing the absence of a genuine issue of fact, but once that burden has been fulfilled, the nonmoving party has the burden of producing evidence that could support a jury verdict in his favor. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514, *Scherer,* 975 F.2d at 360. If doubts remain, however, as to the existence of a material fact, then those doubts should be resolved in favor of the nonmoving party and summary judgment denied. *See Wolf,* 870 F.2d at 1330.

## III. Discussion

Plaintiff offers no direct evidence of Defendant's complicity in her husband's murder. Instead, Plaintiff contends that a reasonable jury could infer her complicity from Defendant's allegedly inconsistent or otherwise unbelievable statements regarding her husband's death and from other allegedly suspicious circumstances surrounding that death. We address these allegations in turn. First, Plaintiff alleges that Defendant lied when she stated that she did not know that she was the primary beneficiary under her husband's Policy. Defendant testified that she did not know this fact. (Def.'s Depo., p. 65) Plaintiff contends that Defendant did know of her status as a beneficiary and that her denial of that knowledge demonstrates her guilt. However, Plaintiff proffers no direct evidence that Defendant, in fact, knew of her status as a beneficiary. Instead, he contends that Defendant's knowledge of her status can be inferred from surrounding facts: namely, that the Decedent made Defendant the primary beneficiary of his Policy on April 29, 1994 and that the two spoke on the telephone for 35 minutes that same evening. It would be unreasonable, Plaintiff contends, to suppose that during this conversation Gregory Kontos did not tell his wife of her status as a beneficiary. As evidence of the couple's telephone conversations, Plaintiff includes an authenticated copy of the Decedent's telephone billing records which show that the Decedent was called in Wetmore, Texas, on his 800 toll-free number once on April 29, 1994 from Indianapolis, Indiana and seven times from April 29 to May 4, 1994

from West Newton, Indiana. See Pl's Designation of Materials, Ex. B. Even if we accept that this evidence demonstrates that the two spoke on the telephone the evening of April 29, 1994 and several more times shortly thereafter, we would be merely speculating as to the subject of their conversation. Therefore, Plaintiff has not presented any evidence that Defendant lied about not knowing of her status as a beneficiary. Without any evidence that Defendant lied, a jury would not be able to reasonably infer that she lied to cover up her involvement in her husband's murder.

■ Plaintiff next contends that Defendant lied about not knowing that her husband was going to visit her in Indianapolis the weekend of his murder. Plaintiff alleges that Defendant told a Lawrence Police Detective that she had not known that her husband would travel to Indianapolis and that his visit was a surprise to her. Plaintiff alleges that Gregory Kontos arranged to travel to Indianapolis on October 21, 1994 and that he and his wife spoke by telephone eight times from October 9 to October 27. Plaintiff further alleges that Defendant had arranged some time in advance of her husband's arrival to be absent from work the day of his arrival in Indianapolis. Even if we accept that the two spoke several times prior to the Decedent's visit, we again cannot speculate as to the content of their conversation. Plaintiff also proffers affidavits of three persons, Barry Steckler, Janet Cook, and Kevin Fairbrother, who testify that Gregory spoke with them and told them that he was traveling to Indianapolis because his wife asked him to visit her and that she was expecting him. See Pl.'s Statement of Genuine Issues, Exs. A–C. Plaintiff, however, cannot use the affidavits to prove that Defendant knew her husband was going to visit her because the affidavits would constitute inadmissible hearsay under Federal Rules of Evidence 801 and 802.

■ Plaintiff contends that Gregory's statements to the three affiants constitute evidence of an existing mental condition that is admissible under Rule 803(3). It is true that statements of a declarant's state of mind may be admitted to show, for example, mo-

tive, competency, ill-will or intent, or lack of intent to defraud. See, e.g., 5 Weinstein's Federal Evidence § 803.06[2] (Matthew Bender, 2d ed.1997). We cannot agree with Plaintiff that Gregory's mental state at the time he requested leave to visit his wife is an issue in this case. It is Defendant's state of mind, specifically whether she knew her husband was going to visit her, rather than her husband's, that is at issue in this case. The authority Plaintiff cites, *United States v. Brown*, 490 F.2d 758 (D.C.Cir.1973), and *United States v. Pheaster*, 544 F.2d 353 (9th Cir.1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977), is inapposite. In the criminal case, *Brown*, the court held that where the defense presented no claim of self-defense, suicide, accidental death, or any other possible issue that would justify an inquiry into the victim's state of mind, the trial court committed prejudicial error in allowing the victim's wife to testify that he was frightened that he would be killed by the defendant. 490 F.2d at 764–70. Therefore, *Brown* provides no support for Plaintiff. *Pheaster's* discussion of the state-of-mind exception, meanwhile, involves the entirely separate issue of the *Hillmon* doctrine. The doctrine, which takes its name from the Supreme Court case *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892), provides that when the performance of a particular act by an individual is an issue in a case, his intention (state of mind) to perform that act may be shown. From that intention, the trier of fact may draw the inference that the person carried out his intention and performed the act. See generally 5 Weinstein's Federal Evidence § 803.07. There is no question in the instant case that the Decedent traveled to Indianapolis to visit his wife. The pertinent question is whether Defendant knew in advance that he was coming. The Decedent's state of mind tells us nothing in that regard. Therefore, we find the proffered testimony to be inadmissible hearsay. Plaintiff does not proffer any admissible evidence that Defendant knew that her husband was coming to visit her. Without such evidence, we cannot infer that Defendant lied about not knowing that her husband was coming to visit her in order to conceal her involvement

in her husband's murder. While Defendant agreed to stipulate for purposes of the summary judgment motion that she knew of her husband's impending visit, we do not take Defendant to mean that she will stipulate that she lied about not knowing that her husband was going to visit her. As to the stipulation, no inference of culpability can be drawn merely from Defendant's knowledge that her husband was going to visit her.

Plaintiff next contends that Defendant's culpability is evidenced by the fact that she had access to a 9-millimeter pistol and that the Decedent was murdered with a 9-millimeter pistol. Defendant testified that her sister, Cherie J. Klawun, once owned a 9-millimeter firearm, but sold the firearm in 1991 or 1992 to David Rosebrock. (Def's Depo., pp. 168–70) Defendant's counsel forwarded to Plaintiff's counsel a copy of a bill of sale for a 9-millimeter gun dated January 27, 1992 that lists Cherie J. Klawun as seller and David Rosebrock as purchaser. (Pl.'s Designation of Materials, Ex. D) Plaintiff seeks to undermine Defendant's denial that she had access to her sister's gun by proffering evidence that Defendant's sister allegedly pulled out and pointed a 9-millimeter semi-automatic pistol at an Indiana State police officer during an undercover narcotics operation on March 18, 1992. *See* Declaration of Steven D. Holland, ¶ 6. This line of proof is too tenuous to implicate Defendant in her husband's murder. Cherie may have indeed sold one 9-millimeter gun on January 27, 1992 and yet pointed a second 9-millimeter gun at a police officer on March 18, 1992. Moreover, evidence that Defendant's sister possessed a 9-millimeter pistol in 1992, or even in 1994, does not constitute evidence that the sister's gun was used to kill the Decedent or that Defendant was in any way involved in her husband's murder.

Plaintiff next seeks to create evidence of complicity from Defendant's subsequent modification of her deposition testimony. At her deposition, Defendant initially stated that she had not been in the area of Lawrence, Indiana, during the weekend her husband was killed. (Def's Depo., p. 138) Later Defendant corrected her response to the following answer: "We stopped at Babes East, for the second time and no other clubs at Pendleton Pike." (*Id.*, Correction Form, p. 2) Plaintiff characterizes Defendant's correction of her testimony as a "recantation" and contends that Defendant's testimony places her "at or near the location where Gregory Kontos's body was discovered." (Pl's Supp. Resp., pp. 5–6) The Court does not understand Defendant's change in testimony to place Defendant at the strip bar where her husband's body was found the night that he was murdered. Consequently, Defendant's testimony does not by itself prove that Defendant was "at or near" the location where her husband's body was found. The fact that Defendant admits to having been in Lawrence, Indiana, does not evidence that she was more likely than not involved in his murder.

Plaintiff also seeks to implicate Defendant by suggesting that there is evidence that she drove Decedent's car farther than merely from the Ramada Inn to the Denny's Restaurant and back again. In support of his allegation, Plaintiff alleges that the odometer on the rental car showed that the car had been driven 84 miles since the Decedent picked it up at the rental site, that the round-trip driving distance from the Airport Ramada Inn to the Denny's Restaurant was only 2.8 miles, and that the driving distance to the location where the Decedent's body and car were found from the Ramada Inn was 22.3 miles, leaving approximately 56 miles of driving unaccounted for. Plaintiff further alleges that the Decedent did not know his way around Indianapolis and did not even have a road map of the city in the rental car. Plaintiff contends that from these facts it is reasonable to infer that Decedent did not drive the rental car for the miles unaccounted for and that, as a resident of Indianapolis, Defendant was the one who more likely drove the car. This is mere speculation, however. Plaintiff does not proffer any actual evidence that Defendant drove her husband's rental car to any place other than to where she testified she drove it. Without such actual evidence (direct or circumstantial), we cannot conclude that Defendant lied about her actions the evening her husband was murdered or further infer that she lied because she is guilty of his murder.

Finally, Plaintiff proffers as evidence against Defendant the fact that when Plaintiff's counsel attempted to depose Defendant's sister, Cherie J. Klawun, Klawun asserted her right to remain silent. (Klawun Depo.) Plaintiff correctly observes that a defendant's assertion of her right against self-incrimination does not prohibit a trier of fact in a civil case from drawing adverse inferences from the witness's refusal to testify. *See Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a party to a *civil cause*'") (quoting 8 J. Wigmore, Evidence 439 (McNaughton rev.1961)) (emphasis in the original); *Matter of Maurice*, 73 F.3d 124, 126 (7th Cir.1995). *Cf. Daniels v. Pipefitters' Ass'n Local Union No. 597*, 983 F.2d 800, 802 (7th Cir.1993) ("We agree that the inference against a witness that may be drawn from the invocation of the Fifth Amendment is permissive"). In this case, we are not confronted with a party's refusal to testify: Defendant allowed herself to be deposed. Instead, it is a nonparty witness with whose refusal to testify we are confronted. Several circuit courts have held that in certain circumstances a nonparty witness's invocation of her right not to testify is admissible and an adverse inference against a party may be drawn from the nonparty's witness's refusal to testify. Recently, in *LiButti v. United States*, 107 F.3d 110 (2nd Cir.1997), the Second Circuit engaged in a thorough review of case law on this issue and, finding its own precedent, *see Brink's Inc. v. City of New York*, 717 F.2d 700 (2nd Cir.1983), in conformity with authority from other circuits, *see RAD Servs., Inc. v. Aetna Casualty and Sur. Co.*, 808 F.2d 271 (3rd Cir.1986); *Federal Deposit Ins. Corp. v. Fidelity & Deposit Co. of Maryland*, 45 F.3d 969 (5th Cir.1995); *Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.*, 819 F.2d 1471 (8th Cir.1987); *Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509 (8th Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984), held that

the question of whether to admit such evidence and whether to allow the concomitant adverse inference must be decided on a case-by-case basis rather than according to any bright-line rule. The *LiButti* court noted that "the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *LiButti*, 107 F.3d at 124.

We do not believe it proper to draw an adverse inference from Klawun's refusal to testify against Defendant. The instant case does not share with the above cases the factual circumstances upon which the courts based their determination that the adverse inferences were trustworthy. For example, in *Brink's* and in *RAD Services* the nonparty witnesses were former or current employees of the party against whom their refusal to testify would be imputed. In *Brink's* the plaintiff contracted with New York City to collect coins from city parking meters. Several Brink's employees were subsequently convicted of stealing parking meter revenues. The City thereupon canceled the Brink's contract. Brink's sued for damages, and the City counterclaimed for breach of contract and negligence. Brink's then filed a third-party complaint against twelve of its current and former employees and their supervisor. The court denied Brink's preliminary motion to preclude the City from questioning the third-party defendants, and at trial the third-party defendants declined to answer any questions. The jury awarded the City compensatory and punitive damages. The Second Circuit affirmed the judgment, agreeing with one commentator's assessment that claims of privilege made while an employee is still working for a defendant can be adopted as a vicarious statement of the defendant employer if the question that triggered the claim related to the employee's work. *Brink's*, 717 F.2d at 710 (citing Heidt, The Conjuror's Circle: The Fifth Amendment Privilege in Civil Cases, 91 Yale L.J. 1062, 1087–88, 1107–35 (1982)). The court also agreed with the commentator that the fact that the invoker of a privilege no longer is an employee of the defendant does not make his refusal to testify any less a vicarious admission of his former employer. *Id.*

In *RAD Services* a company sued its insurer to recover costs incurred in disposing of hazardous waste materials. The insurer disavowed coverage on the grounds that the company allegedly violated the law by intentionally dumping the hazardous materials in question. At trial the insurer read to the jury deposition transcripts of a RAD official and a managing employee, in which the deponents invoked their Fifth Amendment rights. The court instructed the jury that it could, but need not, infer that the witnesses would have answered the insurer's questions adversely to RAD. The jury found for the insurer, and the Third Circuit affirmed.

> [N]othing forbids imputing to a corporation the silence of its personnel. On the one hand, Fed.R.Evid. 801(d)(2)(D) excepts from the hearsay rule a statement offered against a corporate party and made by its "agent or servant concerning a matter within the scope of his agency or employment ... during the existence of the relationship...." The bases for admitting these vicarious admissions against the corporation also justify informing the factfinder when the corporation's agent invokes the Fifth Amendment privilege.

*RAD Servs.*, 808 F.2d at 275.

In *Fidelity & Deposit Company* the Fifth Circuit also concluded that an employee's silence may be imputed against his or her employer, though the court did not engage in much analysis. In that case a bank filed suit against a surety under an employee fidelity bond alleging that the bank's chief lending officer engaged in dishonest and fraudulent activity that resulted in the bank's extending several bad loans. After the bank was closed, the FDIC was appointed the bank's receiver and succeeded as plaintiff in the action. On appeal from a judgment adverse

to the surety, the Fifth Circuit held that evidence of nonparties' invocation of their Fifth Amendment rights was properly admitted. The court noted that other circuits had not precluded a party from having a witness assert his privilege in front of the jury merely because the witness no longer served the party in an "official capacity." *Fidelity & Deposit Co.*, 45 F.3d at 978.[3] In contrast to *Brink's*, *RAD Services*, and *Fidelity & Deposit Company*, the present case does not involve an employment relationship and the reasons that courts have articulated for allowing an adverse inference to be imputed against a witness's employer simply have no place in our analysis. Unlike a claim of privilege by a current or former employee, Klawun's invocation of her right to remain silent cannot be considered a vicarious statement of her sister, Defendant. Plaintiff has not alleged that there is any agency relationship between the two that would make the above case law at all applicable to this case.

The other circuit court cases that have allowed the imputation of an adverse inference from a nonparty witness's refusal to testify, *LiButti* and *Cerro Gordo Charity*, are distinguishable from the instant case in that the courts in these cases found that the nonparty witness and the party against whom an inference would be drawn had allied interests. In other words, the court found that the nonparty witness's own interests would be just as negatively affected by an adverse inference as the party's. In *LiButti* the daughter of a delinquent taxpayer brought a wrongful levy action against the government after the government placed a tax levy on a race horse that it contended was the property not of the daughter but instead of the delinquent taxpayer's commer-

**3.** The Eighth Circuit's holding in *Rosebud Sioux Tribe* is consistent with that of *Brink's*, *RAD Services*, and *Fidelity & Deposit Company*, though the court appears to have been primarily concerned with preventing one party from using the witness's right against self-incrimination as a tactical advantage, which concern is not present in the instant case. The Eighth Circuit reversed a judgment for the defendant in a breach of contract suit after the trial court refused to allow the Tribe to call as a witness an official whom the Tribe believed was colluding with the defendant. Instead the court allowed both parties to read

from the official's deposition testimony which supported the defendant. The Eight Circuit held among other things that the trial court should have permitted the Tribe to call the chairman despite his stated intention to remain silent on the grounds that the deponent was effectively a witness for the defendant. "Once the deposition was allowed into evidence, it was necessary to allow the Tribe to call [the official] as a witness in order to offset the unfair advantage A & P gained by being allowed to use the deposition." *Rosebud Sioux Tribe*, 733 F.2d at 522.

cial stables. The trial court entered judgment in favor of the daughter after a bench trial during which it refused to draw an adverse inference from the father's invocation of his Fifth Amendment right. The Second Circuit vacated the judgment, noting that "Robert and Edith had precisely the same interest against the drawing of adverse inferences from Robert's invocation of the Fifth Amendment: their collective desire that Devil His Due and all of Lion Crest's assets be deemed in Edith's ownership so that they would be insulated from levy by the government. If Robert truly believed that he neither owned Lion Crest and/or Devil His Due nor contributed the funds to acquire the horse, he simply could have answered the questions posed to him about those matters in the negative." *LiButti*, 107 F.3d at 124.

In *Cerro Gordo Charity*, the case most redolent of the instant one, a charitable trust created by an insured's half-brother brought an action to recover proceeds from life insurance policies after the insured was murdered. The charity was the beneficiary of several accidental death and dismemberment insurance policies taken out on the insured's life. The insurers denied payment on the ground that the policies were obtained as a result of a fraudulent scheme by the insured's brother to have his sister murdered in order to collect the insurance proceeds. The trial court allowed the insurers to call the brother to the stand even though he had made it known that he would invoke his right to remain silent. The jury returned a special verdict, finding that the brother had intentionally killed his sister to obtain the insurance proceeds. The Eighth Circuit held that a negative inference against the charitable trust could be drawn from the brother's refusal to testify because there was evidence that the brother and the charitable trust had the same interests.

There is reason to believe that Richards [the half-brother] still retains some loyalty to Cerro Gordo. These suits were brought in the name of Cerro Gordo when Richards was still a controlling member of the charity. Although it is true that Richards is not presently listed as a director or voting member of the charity, there is some question whether he retained some control over the charity and whether his resignation as a voting member after these suits were filed was not purely a matter of litigation strategy.

*Cerro Gordo Charity*, 819 F.2d at 1481–82. In both *LiButti* and *Cerro Gordo Charity*, then, the courts determined that there was an identity of interests that made the adverse inference trustworthy. We do not have the same identity of interests in the present case. Klawun is not named as a beneficiary of the Decedent's Policy. She does not necessarily have the same interest as her sister in her sister's accession to the proceeds of the Policy. For reasons unknown to the Court, Defendant's sister may wish to undermine Defendant's right to the proceeds. Or the sister may have reason to invoke her privilege against self-incrimination while Defendant has none. This possibility is suggested by the fact that Defendant allowed herself to be deposed. It could be entirely possible that, while Klawun played a role in the murder of Defendant's husband, Defendant had no knowledge of the murder and played no part in it. In this case, drawing an adverse inference from Klawun's refusal to testify would not aid the search for truth, but in fact would hinder that search. We cannot say that there is a sufficient basis to conclude that an adverse inference would be trustworthy. Therefore, we find that Klawun's refusal to testify is not admissible against Defendant.

■■■ Even if Klawun's refusal to testify were admissible, we do not think that the resulting adverse inference would be a sufficient basis upon which a reasonable jury could conclude that Defendant was involved in her husband's murder. Before an adverse inference may be drawn from a party's refusal to testify in a civil case, there must be independent corroborative evidence to support the negative inference beyond the invocation of the privilege. *See Baxter*, 425 U.S. at 318, 96 S.Ct. at 1558 ("the Fifth Amendment does not forbid adverse inferences against parties ... when they refuse to testify *in response to probative evidence offered against them*") (emphasis added); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir.1995); *United States v. Stelmo-*

*kas,* 100 F.3d 302, 311 (3rd Cir.1996); *United States v. Incorporated Village of Island Park,* 888 F.Supp. 419, 445 (E.D.N.Y.1995) (the government may rely on a defendant's assertion of his privilege against self-incrimination to show intent only if that inference is supported by independent evidence); *United States v. Private Sanitation Industry Ass'n,* 899 F.Supp. 974, 982 (E.D.N.Y.1994) ("liability should not be imposed based solely upon the adverse inference"), *aff'd* 47 F.3d 1158 (2nd Cir.), *cert. denied sub. nom., Ferrante v. United States,* —— U.S. ——, 116 S.Ct. 50, 133 L.Ed.2d 15 (1995). As the Seventh Circuit stated in *LaSalle Bank Lake View v. Seguban:*

> Thus, although "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them," an analysis of that evidence is nonetheless required. Silence is a relevant factor to be considered in light of the proffered evidence, but the direct inference of guilt from silence is forbidden.

*Seguban,* 54 F.3d at 390 (quoting *Baxter,* 425 U.S. at 318, 96 S.Ct. at 1558). Consequently, "although inferences based on the assertion of the privilege are permissible, the entry of judgment based only on the invocation of the privilege and 'without regard to other evidence' exceeds constitutional bounds." *Seguban,* 54 F.3d at 391 (quoting *Baxter,* 425 U.S. at 318, 96 S.Ct. at 1558). While *Seguban* involved the invocation of the right to remain silent by parties and not by nonparty witnesses, we cannot say that its holding is inapplicable to the instant case. Therefore, even if Klawun's refusal to testify were admissible evidence, that evidence alone would not establish a prima facie case that Defendant was involved in the murder of her husband.

## IV. Conclusion

In this case, Plaintiff proffers no actual evidence that Defendant was involved in the murder of her former husband. Instead, Plaintiff asks the court to substitute speculation for evidence. However, as noted above, speculation does not create a genuine issue of fact. *See Tyler v. Runyon, supra.* Conse-quently, Plaintiff has failed to demonstrate that there is any genuine issue of material fact to be resolved by a jury or that judgment should not be entered in favor of Defendant as a matter of law. Therefore, the Court grants summary judgment in favor of Defendant Cheryl J. Kontos and against Plaintiff John W. Kontos. The parties are to bear their own costs.