## CONTINENTAL ASSURANCE CO. *vs.* BRIDGET DIORIO-VOLUNGIS & another.[1]

No. 98-P-2332.

Worcester. February 7, 2001. - April 27, 2001.

Present: JACOBS, DUFFLY, & CYPHER, JJ.

*Accessory and Principal. Evidence,* Inference, Presumptions and burden of proof, Privileged communication. *Public Records. Police,* Records.

In a civil action brought by the administrator of an estate contesting the decedent's widow's claim to the proceeds of an insurance policy on the life of the decedent, who had been murdered, the administrator did not prove by a preponderance of the evidence that the decedent's wife had been an accessory before the fact to the murder, and consequently the judge correctly allowed the decedent's widow's motion for judgment notwithstanding the verdict. [408-411]

In a civil action in which a party sought access to police investigation materials relating to a murder, the judge did not err in ruling that the information was protected from disclosure by the common law investigatory privilege and that the party had not demonstrated the materials were exempt from G. L. c. 4, § 7. [411-413]

CIVIL ACTION commenced in the Superior Court Department on February 16, 1993.

The case was tried before *Stephen E. Neel,* J.

*R. Mark Petersen* for Linda Marie Volungis.

*Penelope A. Kathiwala* for Bridget Diorio-Volungis.

CYPHER, J. On February 3, 1992, the night before John Volungis (John) was scheduled to leave town for active military duty, he was stabbed to death by an unknown assailant. No one has been charged in the crime. Bridget Diorio-Volungis (Bridget), John's widow and the sole beneficiary of John's $150,000 life insurance policy, attempted to collect the proceeds. Linda Marie Volungis (Linda), John's mother and administrator

---

[1] Linda Marie Volungis, administrator of the estate of John E. Volungis, Jr.

of John's estate, contested the claim, alleging that Bridget was complicit in John's murder. Continental Assurance Company, the issuer of the policy, filed a complaint for interpleader in Superior Court to resolve the dispute. Linda filed a cross claim against Bridget incorporating her allegations.

The cross claim went to a jury trial on the sole question, "Has plaintiff, Linda Marie Volungis, proved by a preponderance of the evidence that defendant Bridget D[i]orio Volungis was an accessory before the fact of the murder of John E. Volungis, Jr.?"[2] The jury answered, "Yes." The judge allowed Bridget's motion for judgment notwithstanding the verdict,[3]

---

[2]The judge framed this special verdict question for the jury pursuant to G. L. c. 231A, § 13; G. L. c. 214, § 13; and Mass.R.Civ.P. 39, 365 Mass. 801 (1974). He arrived at the form of the question as follows. At a pretrial conference, Linda's counsel indicated that she sought a jury trial, in which she would prove not that Bridget was the principal or a joint venturer in the murder, but only that she was an accessory before the fact. Linda's theory was that a civil finding that Bridget was an accessory before the fact, standing alone, would bar Bridget from receiving the insurance proceeds under *Slocum* v. *Metropolitan Life Ins. Co.*, 245 Mass. 565, 567 (1923), which held that public policy prohibits "a beneficiary who has feloniously taken the life of the insured" from recovering on the insurance policy. (Citing *id.* at 568, Linda further contends the proceeds should pass to John's estate because the policy names no contingent beneficiary.) Linda's counsel assented to bearing the burden of proof by a preponderance of evidence.

Although the parties agreed to be characterized as plaintiff and defendant to simplify matters for the jury, Bridget disagreed in the main with Linda's approach. Bridget raised three major arguments: (1) that trial should be before a judge rather than a jury because the claim was equitable in nature; (2) that proof of the claim should be by clear and convincing evidence; and (3) that even if Linda proved Bridget an accessory before the fact in a civil trial, that would not satisfy the test set out in *Slocum.*

The judge ruled against Bridget on the first two issues, but reserved decision on Bridget's last point of law, preferring first to submit to the jury the factual question of Bridget's accessory status. In light of his later allowance of Bridget's motion for a judgment notwithstanding the verdict, he never ruled on the reserved point. Likewise, we express no opinion on that subject. Additionally, the propriety of the judge's rulings on standard of proof and the use of a jury trial is not before us.

[3]Linda's claim that Bridget's motion for judgment notwithstanding the verdict was procedurally defective under Mass.R.Civ.P. 50, 365 Mass. 814 (1974), is without merit. At a sidebar conference, Linda stated that she intended to rest. Bridget indicated that she would immediately rest without presenting any evidence, and moved for a directed verdict. The judge denied the motion and then both parties rested in open court. Upon consideration of

concluding that "there was no basis in the evidence upon which the jury could have found that [Bridget] even knew that a crime was going to be committed, let alone hired or procured someone to commit murder."[4] On appeal from the final judgment awarding the policy proceeds to Bridget, Linda challenges the judge's decision on Bridget's motion as well as certain other rulings to be described later in this opinion.

We first consider whether the evidence, in the light most favorable to Linda and drawing all reasonable inferences therefrom, reasonably could have supported a verdict for Linda. See *Cambridgeport Sav. Bank* v. Boersner, 413 Mass. 432, 438 (1992).

1. *The facts.*

In the light most favorable to Linda, the evidence established the following facts. In February, 1992, Bridget, age 33, and John, age 21, had been married for fourteen months. They had been separated "off and on" during their marriage. During one of these separations, Bridget dated another man. In mid-September 1991, they were separated, although Bridget, who was called as a witness by Linda, testified that they "went together" throughout the separation. Depending on his work schedule, John spent half of his time at his parents' home and half of his time at Bridget's home, until the separation ended in January, 1992.

John worked two part-time jobs and received a monthly check from the army reserve. He contributed, although not significantly, to the financial well-being of Bridget and her children from a previous marriage.

---

the motion for judgment notwithstanding the verdict, the judge deemed a motion for directed verdict to have been made after each party rested, and noted that he had, for convenience, handled the motion at sidebar just before the parties rested in open court. See *Wells Real Estate, Inc.* v. *Greater Lowell Bd. of Realtors*, 850 F.2d 803, 810 n.7 (1st Cir. 1988) (failure to repeat motion for directed verdict not fatal where such motion would be superfluous). Cf. *King* v. *G & M Realty Corp.*, 373 Mass. 658, 659 n.3 (1977). Contrast *Michnik-Zilberman* v. *Gordon's Liquor, Inc.*, 390 Mass. 6, 8-9 (1983); *Dalrymple* v. *Winthrop*, 50 Mass. App. Ct. 611, 618-619 (2000).

[4]Linda was not limited under her accessory theory to proving that Bridget procured or hired the principal. Aiding or counseling the principal would also be sufficient, provided Bridget did so with the requisite knowledge and intent. See *Commonwealth* v. *Raposo*, 413 Mass. 182, 185 (1992); *Commonwealth* v. *Green*, 420 Mass. 771, 779 (1995).

On the morning of January 9, 1992, Bridget telephoned her insurance agent, Donald Dunnigan, and asked him to prepare some life insurance proposals. She told him that her husband would be leaving in a short period of time and so the sooner she and Dunnigan could meet, the better. Dunnigan prepared several whole life and term life proposals, ranging from $100,000 to $250,000 in coverage, as specified by Bridget.

Dunnigan presented the proposals to Bridget and John that evening. Bridget decided that they would each purchase a ten-year policy for term life insurance in the amount of $150,000. Bridget and John completed the applications and named each other as beneficiaries. Bridget gave Dunnigan the premium payments in cash and Dunnigan made separate receipts for them.[5]

On Friday, January 31, 1992, some three days before John's death, Nancy Zumpfe, a manager at Insurance Marketing Agencies, answered a telephone call for Dunnigan on a shared telephone system. According to Zumpfe, the caller wanted to know if the life insurance policies for her and her husband were in effect. After determining that the caller was Bridget and gathering other information about the policy, Zumpfe advised her to call the insurance company directly and provided her with a telephone number. Bridget did not mention that she had received checks from the insurance company.[6] Zumpfe had never received a telephone call like this one during her nine years of experience working at Insurance Marketing Agencies.

On February 3, 1992, the night before John was scheduled to leave for six months of active military duty, Bridget made three

---

[5] A paramedical professional later examined Bridget and John in connection with their applications.

[6] Although not relevant to our analysis under the applicable standard, we include some information for background understanding. Bridget testified that she had telephoned the insurance agency because both she and John received checks from the insurance company, one for approximately thirty dollars and one for approximately seven dollars and she was not sure what to do with them. She was told to call the home office and given a telephone number. She denied that she inquired whether the policy was in force. As a result of her conversation with customer service, Bridget deposited her check and left John's check for him. At trial, John's check and envelope were received as exhibits. On the back of the envelope, in Bridget's handwriting, was an "800" number for customer service in Tennessee.

or four telephone calls to John at his parent's home.[7] The first and second time she called, John was not home so she spoke with his sister, April Volungis (April). The third or fourth time she called, she spoke with Linda. John walked into his mother's house during this call and Linda handed him the telephone. Bridget told John that she would be able to pick him up to bring him home that night. April had expected to drive John to Bridget's house.

At 5:00 P.M., Bridget left work and went to her son's basketball game. Shortly after arriving at the game, Bridget went home.[8] She did not notice anything amiss. While there she "used the [tele]phone" but did not make any outgoing calls. After eight to ten minutes, Bridget left through the garage and returned to the basketball game. She remembered watching the automated garage door close, but could not recall if she had locked the door leading from the garage into the house.

After the game, Bridget drove a relative home and then brought her children and one of their friends to the friend's house. Sometime between 7:00 and 7:30 P.M., Bridget picked up John at his parents' house and drove him to her house, dropping him off in the driveway and opening the garage door for him with her remote device. At approximately 7:40 P.M., Bridget picked up her children from their friend's house and brought them to her sister's house, where Bridget had arranged for her nephew to babysit that night. There had been some discussion earlier in the day between Bridget and her sister concerning how late Bridget might be out and whether the children should spend the night. Bridget spoke with the people in her sister's house before she left.

Approximately forty-five minutes after dropping John off at her house, Bridget returned home to find John lying in a pool of blood. He had been stabbed multiple times. Bridget ran next door to her brother's house, but no one was home. She ran to a

---

[7]Bridget testified that she and John had discussed "two different options of what would be going on that night" and she wanted him to know she would be able to pick him up. They had planned to have garlic pizza at the Wonderbar, a favorite place of John's, to mark his departure for military duty.

[8]Bridget explained that she went to the upstairs bathroom for a tampon and changed her pants and underwear.

second neighbor, but again, no one was home. She ran across the street to a third neighbor and told him to call "9-1-1."

Bridget went to the police department that night and spoke with the police. She answered all of their questions, detailing her activities that day and providing information about John. Bridget left the police station at 4:00 A.M. the next morning and returned home. Bridget discovered that the telephones in her home were missing. Bridget never spoke to the police again and never called to inquire about the status of the investigation.

April testified that, on January 8, 1992, John told her that Bridget wanted him to take out a life insurance policy and that if anything happened to him, April should go to the police and tell them that his wife had him killed. April advised him not to sign the insurance application, but John replied that he would be safer if he signed it and just went away.

Linda testified that, on January 9, 1992, John told her that he had to go to Bridget's house to sign an insurance policy. He said that he had to do it or he could not go back to Bridget and that "there was going to be a contract put out on him."

John had problems with a person at work. On Thursday, January, 30, 1992, five days before he was murdered, John had testified in court against this person in a criminal proceeding.

2. *Discussion.*

To sustain the finding that Bridget was an accessory before the fact to John's murder, Linda had to prove, by a preponderance of the evidence,[9] (1) that someone other than Bridget murdered John[10]; (2) that Bridget aided, counseled, hired, or otherwise procured the murder to be committed; and (3) that Bridget did so with the same intent the principal would have to

---

[9]"By a preponderance of the evidence" means that the trier of fact had to conclude that it was more probable than not, *Goffredo* v. *Mercedes-Benz Truck Co.*, 402 Mass. 97, 102-103 (1988), that Bridget aided, hired, counseled or procured another to murder John. If the proposition is as probably false as it is true, then the plaintiff has not met her burden. *Corsetti* v. *Stone Co.*, 396 Mass. 1, 24 (1985). See *Sargent* v. *Massachusetts Accident Co.*, 307 Mass. 246, 251 (1940) (where evidence tends equally to support two inconsistent propositions, neither can be found to be true).

[10]The parties effectively agreed that John was murdered.

have had to have been found guilty of murder (i.e., malice).[11] "[W]hat is required to be convicted as an accessory before the fact is not only knowledge of the crime and a shared intent to bring it about, but also some sort of act that contributes to its happening." *Commonwealth* v. *Raposo*, 413 Mass. 182, 185 (1992). "[M]ere knowledge that a crime is to be committed, even when coupled with subsequent concealment of the completed crime, does not make one guilty as an accessory before the fact . . . ." *Commonwealth* v. *Perry*, 357 Mass. 149, 151 (1970).

As the trial judge noted, there was "ample evidence from which the jurors could have concluded that [Bridget] had a motive to have her husband killed, and took actions that contributed, even if unknowingly and unintentionally, to the killing." To determine whether Bridget took those actions with the knowledge and intent that John would be killed depends on the inferences that may be drawn from the evidence. Inferences "must be based on probabilities rather than possibilities and cannot be the result of mere speculation and conjecture." *Cambridgeport Sav. Bank* v. *Boersner*, 413 Mass. at 438, quoting from *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 706-707 n.3 (1990). An inference may be based on another inference, provided the inference is not speculative. *Commonwealth* v. *Dostie*, 425 Mass. 372, 375-376 & n.6 (1997), citing 1A Wigmore, Evidence § 41 (1983).

Linda urges us to consider the following "combination of circumstances" when determining whether she proved by a preponderance of the evidence that Bridget aided the principal with the knowledge that John would be killed and that she shared the intent of the principal. The marriage was brief and troubled; Bridget dated another man while separated from John;

---

[11]General Laws c. 274, § 2, as amended through St. 1973, c. 529, § 1, provides that "[w]hoever aids in the commission of a felony, or is accessory thereto before the fact by counseling, hiring or otherwise procuring such felony to be committed, shall be punished in the manner provided for the punishment of the principal felon."

John believed that Bridget would have him killed[12]; Bridget recently purchased life insurance on John, despite the fact that he contributed little to her financial security; shortly before John's murder, Bridget was concerned whether the policy was in effect; Bridget's conduct in the hours before John's death, in leaving her son's basketball game and going home for eight to ten minutes, and in later driving John home but not going into the house with him, was suspicious.[13]

While it is appropriate to consider whether in the evidence any combination of circumstances could be found from which reasonable inferences could be drawn, *Anthony H.* v. *John G.,* 415 Mass. 196, 199 (1993), the plaintiff must establish the essential elements of the claim "either by direct evidence or rational inference of probabilities from established facts." *Zezuski* v. *Jenny Mfg. Co.,* 363 Mass. 324, 329 (1973), quoting from *Bigwood* v. *Boston & N. St. Ry. Co.,* 209 Mass. 345, 348 (1911). If a necessary part of the case is left to pure speculation, or if a vital portion of proof is established by a mere scintilla of evidence, then the plaintiff has not met the burden of proof. See Hartmann v. Boston Herald-Traveler Corp., 323 Mass. 56, 59 (1948).

Linda's argument is seductive. Upon examination, however, it proves to be circular. The inference that Bridget's actions in going home for a short period of time and later driving John home constituted "aid" within the meaning of G. L. c. 274, § 2, is premised upon the evidence establishing that Bridget had a motive to have John killed and depends on Bridget knowing that John would be killed. In turn, the inference that Bridget knew John would be killed is predicated on the fact that she drove him home, coupled with her motive to have him killed. Thus, the trial judge correctly concluded that such evidence "does not permit the jury to infer, other than by speculation, that [Bridget] had any knowledge, beforehand or at the time of

---

[12]Assuming this evidence was properly before the jury and that it was believed, this evidence provided the jury with no facts concerning the basis of John's belief and depicted John's state of mind, not Bridget's state of mind.

[13]The jury were asked to conclude that she went home to let the principal actor in or to leave the door unlocked for the principal actor, and possibly to remove the telephones.

the crime, that her husband would be murdered."[14] See *Commonwealth* v. *Ellis*, 356 Mass. 574, 578-579 (1970) (inference that defendant intended to sell heroin was probable based on amount of heroin found; but inference that defendant intended to sell morphine based on inference of intent to sell heroin, where only a small amount of morphine was found, was merely a possibility); *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 664 n.4 (1981) (discussing *Commonwealth* v. *Ellis, supra,* as providing an example of difference between speculation and reasonable inference). Compare *Kontos* v. *Kontos*, 968 F. Supp. 400, 403, 409 (S.D. Ind. 1997) (summary judgment granted in favor of wife of insured decedent where secondary beneficiary did not establish sufficient evidence of a genuine issue of material fact as to wife's complicity in husband's murder, even in light of evidence of motive and suspicious circumstances), with *Cora Pub, Inc.* v. *Continental Cas. Co.*, 619 F.2d 482, 486 (5th Cir. 1980) (circumstantial evidence sufficient to establish that defendant committed arson where inferences were adequately established in evidence).

The judge properly allowed Bridget's motion for judgment notwithstanding the verdict.

3. *Remaining issues.* a. Public record exemption for investigation materials. Before trial, the district attorney for the middle district moved to quash Linda's subpoena for testimony and records from the Worcester police department regarding the criminal investigation of John's death. The basis of the motion was that the information was protected from disclosure by the common law investigatory privilege[15] and the statutory exemption to the public records law for investigatory material, G. L. c. 4, § 7, Twenty-sixth (*f*) (exempting "investigatory materials necessarily compiled out of the public view by law enforcement

---

[14]We do not take the judge's decision as finding competent circumstantial evidence inadequate and requiring direct evidence of knowledge or intent.

[15]"It is a principle of law founded upon sound public policy and arising out of the creation and establishment of constitutional government that communications made to a district attorney in order to secure the enforcement of law are privileged and confidential in the sense that they cannot be revealed at the instance of private parties in aid of actions at law." *Attorney Gen.* v. *Tufts*, 239 Mass. 458, 490-491 (1921). Police are generally considered members of the prosecution team. See *Commonwealth* v. *Tucceri*, 412 Mass. 401, 407 (1992).

or other investigatory officials the disclosure of which materials would probably so prejudice the possibility of effective law enforcement that such disclosure would not be in the public interest"), inserted by St. 1973, c. 1050, § 1.[16]

The judge proceeded as though Linda had sought a judicial remedy after following the administrative procedures specified in the public records law.[17] Accordingly, the judge held a voir dire of the investigating detective whom Linda sought to call as a witness, using for guidance the analysis set forth in *Globe Newspaper Co.* v. *Police Commr. of Boston*, 419 Mass. 852 (1995), to determine whether the investigatory exemption applied.[18]

The assistant district attorney questioned the detective and elicited sufficient detail to support the judge's conclusion that investigation was ongoing,[19] that the police had not disclosed investigation information to the press, and that disclosure would prejudice the open investigation.[20] There was no error, as the testimony of the detective met the burden of proving with specificity that the exemption applied. See *id.* at 857 (government agency refusing to comply with disclosure request has

---

[16]General Laws c. 66, § 10(*c*), establishes a presumption that government records are public. See *Globe Newspaper Co.* v. *Police Commr. of Boston*, 419 Mass. 852, 857 (1995).

[17]General Laws c. 66, § 10(*b*), provides for administrative remedies if a custodian of a public record fails to comply with a request for a public record, but does not limit the judicial remedies otherwise available to the person requesting a public record.

[18]As the judge noted, the question remained whether, if the investigatory exemption did not apply, the evidence was admissible at trial.

[19]The homicide occurred in 1992. As of the date of the trial in June, 1997, the investigation was considered open and active. In fact, in opposition to Bridget's motion for summary judgment, Linda asserted that the investigation was still open.

[20]For example, the officer testified that the investigation was ongoing; that private citizens had given statements to the police but had expressed concern about being involved in the case; and that the police had deliberately limited the information released to the press. After the assistant district attorney finished questioning the officer, both counsel declined the opportunity to cross-examine. The judge indicated his willingness to reconsider the issue if Linda could establish that the police had revealed information to the press about the investigation, but Linda did not further pursue the matter except to renew her original arguments in opposition to the motion to quash.

burden of proving "with specificity" that information requested is within statutory exemption to disclosure).

Linda does not point to any error in the findings or rulings of the judge, but claims only that the assistant district attorney's affidavit in support of the motion to quash was inadequate to support the judge's ruling and, therefore, that the judge should have conducted an inspection of the file in camera. Linda ignores the voir dire testimony of the officer. Here, where the judge credited the officer's detailed testimony, an inspection in camera was not required. Contrast *id.* at 856 n.5 (judge declined to accept testimony of police officer as determinative on issue whether investigatory exemption applied, and conducted an inspection in camera). There was no error. See *Bougas* v. *Chief of Police of Lexington*, 371 Mass. 59, 61 (1976) (reviewing court will reverse determination that investigatory exemption applies only where findings are clearly erroneous or rulings are tainted with error of law).

b. Exclusion of testimony by Bridget's attorney in the criminal investigation concerning whether he told the police not to contact her. Linda also claims that the judge erred in excluding, on the grounds of attorney-client privilege, the testimony of an attorney who had represented Bridget with regard to the investigation of John's murder. Linda does not appear to understand the basis for the judge's ruling. Although the attorney asserted attorney-client privilege during a voir dire and the judge carefully considered whether the attorney-client privilege applied, the judge found the proffer insufficient and instead excluded the evidence on the grounds that the testimony Linda sought to introduce was inadmissible hearsay and not sufficiently material. As Linda does not challenge the judge's ruling on these grounds, we do not address the issue any further.

*Judgment affirmed.*